THE SAVANNAH, FLORIDA AND WESTERN RAILWAY COMPANY *v.* DAY.

1. There being evidence tending to show that the plaintiff's husband, a brakeman employed upon one of defendant's freight-trains, was killed by being knocked from the top of a car by a low bridge over defendant's road, and there also being evidence from which the jury might have inferred negligence on the part of the railroad company in failing to keep in suitable order warnings of the approach of trains to the bridge, and it not appearing from the testimony introduced by the plaintiff that the deceased was himself guilty of any negligence, the motion for a nonsuit was properly overruled, and the court rightly submitted to the jury the determination of the questions of fact involved.

2. In view of the evidence above stated, there was no error in refusing to charge the jury as follows, "In a suit against a railroad company by one of its servants for injuries sustained by alleged negligence of others of its servants in the performance of an act with which the servant was connected at the time of the injury, then the presumption of negligence was not against the company before the plaintiff proved that the servant was without fault," such request being inapplicable to the case presented.

3. Although the court may have erred in its explanation to the jury of the mortality and annuity tables introduced in evidence, and the methods of their use, such error would be no cause for a new trial when it manifestly appears that it in no way misled the jury or caused them to overvalue the life of the deceased.

4. The evidence warranted the verdict, both as respects the negligence of the defendant, and the absence of contributory negligence on the part of plaintiff's husband.

LUMPKIN, J., dissenting. The evidence, taken as a whole, showing conclusively that although the company may have been guilty of some negligence, the deceased was certainly negligent, and might by the exercise of ordinary care have avoided the injury which caused his death, the verdict was contrary to law and the evidence, and should have been set aside.

July 26, 1893. Argued at the last term.

Before Judge ATKINSON. Wayne superior court. October term, 1891.

ERWIN, DUBIGNON & CHISHOLM, S. T. KINGSBERY and S. R. HARRIS, for plaintiff in error.

D. M. CLARK and HARRIS & SPARKS, *contra.*

LUMPKIN, Justice.

The court is unanimous as to the rulings made in the first three head-notes, and we all agree that the evidence was sufficient to show that the defendant was negligent. We differ as to whether or not the evidence warranted the jury in finding, as they did, that the plaintiff's husband was not guilty of contributory negligence. A majority of the court is satisfied with the verdict in this respect, but the writer is not. I will endeavor to state the views of the entire court so far as we agree, and also to state the views of my brethren and of myself upon the question at issue between us.

1. Plaintiff's husband was engaged, at the time of his homicide, in the capacity of brakeman on one of defendant's freight-trains. The precise manner in which he met his death is entirely a matter of conjecture, but presumably he was stricken down by coming in contact with a low bridge which spanned defendant's road, and after being carried in an insensible condition a mile or more on top of the train, was finally jolted off, and falling between the cars, was run over. In support of this theory, plaintiff introduced evidence showing that his body, fearfully mangled, was found at a distance of a mile or further beyond the bridge, in the direction towards which the train was proceeding; that blood could be traced along the track from that point to within a few yards of the bridge, and near this latter point his cap was found. Upon the head of the deceased were a number of bruises, one upon the temple, though the skull was not fractured; and to all appearances, death resulted from his having been run over by the train, his

lower limbs being almost entirely severed from his body. The negligence relied on was the maintenance by the company of a bridge over its line of railway, which was a constant menace to the safety of its employees and imperiled their lives, it being so low that a man could not stand erect on the top of an ordinary box-car and pass under it with safety; and the failure by the company to keep in proper condition and repair "telltales" which had been erected on either side of the bridge for the purpose of warning employees on top of its trains of approach thereto. It was shown by the plaintiff that the bridge was an exceedingly dangerous place to those whose duty called them upon the top of a train, and that it was absolutely essential that the appliance called a "telltale" should be kept in constant and thorough repair in order that it might give to employees the warning for which it was designed. Plaintiff further introduced evidence tending to show that on the morning of the accident, within a few hours after the train had passed, one or two, and possibly three, of the ropes which hung down from the cross-beam of the "telltale" on the opposite side of the bridge from that on which the deceased was found, were observed to be out of place, having been thrown up from some cause, so as to hang too high to strike a man passing under them on top of a box-car. There was nothing in the plaintiff's evidence from which it could be inferred that the deceased himself was guilty of any negligence, or could have avoided injury by the exercise of proper diligence. Under this testimony, we think a question of negligence was raised which it was proper to submit to the jury for determination, and that therefore the court rightly overruled the defendant's motion to nonsuit the case.

2. Complaint was made that the court refused to give in charge to the jury the request set out in the second head-note, counsel for the railway company calling at-

tention to the fact that the request was framed in the precise language used by this court in *Western & Atlantic R. R. Co.* v. *Vandiver*, 85 *Ga.* 470, and insisting that the refusal of the trial judge to so instruct the jury was erroneous. Certainly, the request in question correctly states a well-known legal principle, but one which is not applicable to the facts of this case. That principle is, that an employee who characterizes as negligent an act in the performance of which he as well as others of the company's servants was engaged, cannot, without showing himself free from fault, successfully rely upon any presumption of negligence by the company as a basis of recovery. In other words, where two or more employees are engaged in the prosecution of a common enterprise which results disastrously, the law will not do violence to reason and consistency by presuming one who may be injured thereby free from fault, and at the same time imputing negligence to his fellow-servants who were engaged with him in the performance of the very act of which he complains. It is manifest, however, that this rule has no applicability to the facts of the present case. The negligence complained of is, that the company maintained a "man-trap" over its line of road, and signally failed in its duty to provide proper warnings to those on its trains of approach thereto. This was a duty devolving solely upon the master, and was a matter with which the plaintiff's husband had no connection whatsoever. His sole duty was to perform service to the company in the capacity of brakeman. If the company negligently failed to keep in proper condition and repair its signals of danger, this was negligence in which the plaintiff's husband took no part, and with which he could in no event be made chargeable. Had he been a servant of the company, whose duty it was to look after and keep in repair the "telltales" at this bridge, an entirely different case would be presented.

It was not shown, however, that any such duty was comprehended in the service for which he was retained by the company. Indeed, the fact that he was employed as brakeman on a moving freight-train would, in the absence of direct proof to the contrary, completely negative such an idea.

3. It has several times been ruled by this court that although the trial judge may have inaccurately stated to the jury the purpose of the mortality and annuity tables introduced in evidence, and the methods of their use, such error would, of itself, be no cause for a new trial when it manifestly appears that it in no way misled the jury or caused them to overvalue the life of the deceased. The amount of damages awarded by the jury in the present case, $1,560, would seem to negative the idea that any harm to the defendant company resulted from any error committed by the judge in presenting this question, and therefore such error presents no cause for setting the verdict aside.

4. The following is a fair statement of the undisputed facts, as they appear from the record: The deceased left Savannah at night on a freight-train bound for Waycross. On reporting for duty at the former place, the conductor asked him if he was familiar with the road, and upon being informed by the deceased that he had been running on the road only a week or so, cautioned him expressly as to the danger of the bridge in question, and one other at a different point. Deceased replied he had already been told about them. The conductor then left him. Before leaving the yard at Savannah, another train-hand also approached deceased, asked him as to his familiarity with the road and the length of time he had been running on that line, and cautioned him as to the dangerous bridges, describing their location. Upon learning that deceased was a new man, this train-hand volunteered to exchange places with him on the down

trip to Waycross, saying that as the road was dangerous in the night-time to one unfamiliar with the same, he would ride as front brakeman on top of the train, while deceased could ride in the cab, where his safety would be insured. This arrangement was carried into effect, and the deceased reached Waycross, the end of the journey southward, without mishap or accident. A new train was there made up, and the crew started on their return trip to Savannah, and proceeded without misadventure as far as Jesup. There it became necessary to " drill off"" a car in order that it might be delivered to another road. The car in question was the eighteenth one from the engine, and in order to do this, the bell-cord had to be carried back to the nineteenth car, and after the train was again coupled, carried over the top of the cars to the engine. It was then daylight, about 5.25 in the morning. The bridge in question was only some three or four hundred yards distant from this station, in the direction of Savannah. Upon starting on the return trip, the deceased took his position on top of the train, and it became his duty to carry the bell-cord back to the engine. It appears that the bridge just ahead was then, before the train started, specially pointed out to him, and his attention directed to its dangerous character. His fellow-brakeman testified: " When we got back to Jesup, we drilled off some cars down in the yard. I told him, if you can get that bell-cord over before you get to that bridge, do it. If you can't, wait until you get to the other side of the bridge. He said all right, and he went right on and had no trouble at all. That was daylight." When last seen by any of the crew, deceased had performed the duty of carrying the bell-cord over the train, and was standing on the box-car next to the engine, facing the bridge, which was only some fifty or sixty feet distant at that time. He was observed thus standing by the conductor,

by one of the brakemen, and by the engineer. The latter testified that he last saw deceased as he was in the act of throwing the bell-cord over to the fireman, who was engaged in tying it to the gong in the cab as the engine passed under the bridge. It is thus apparent that the fireman, who was not introduced as a witness, would have been unable to throw additional light upon the question of how deceased met' his death. None of the crew saw him when he was struck by the bridge, if, indeed, he was so stricken. All agreed that the morning was clear; that he could be seen distinctly; and that neither the smoke from the engine, nor any other cause known to them, could have prevented him from seeing the bridge. Whether, in point of fact, he did or did not see it, can now never be definitely known. His absence from the train was not discovered until the second station from the bridge had been reached, the conductor testifying he presumed the deceased was riding on the engine, not having seen him on top of the train after the bridge was passed. Plaintiff offered no evidence to contradict the testimony given by defendant's witnesses, nor was any attempt made to impeach or discredit any one of them.

We all think the plaintiff made out a *prima facie* case of negligence, and that the evidence introduced in her behalf (no negligence on the part of her deceased husband appearing therefrom) was sufficient to authorize a recovery in her favor. The real question is, did the evidence introduced by the defendant show conclusively and indisputably that the plaintiff's husband could, by the use of ordinary diligence, have avoided the injury which resulted in his death; and if so, was his failure to do this such contributory negligence on his part as would defeat a recovery. The Chief Justice and Brother SIMMONS are of the opinion that the deceased had the right to rely upon the " telltale " as a means not only of

warning him of the approach of the train to the bridge, but of arresting his attention at the place where the "telltale" was located, and causing him to look out for danger ahead. It being the duty of the company to provide in some way for warning its employees of the danger in question, and it having adopted this method of giving such warning, it was their imperative duty to keep the "telltale" constantly in proper order for this purpose, and the deceased had a right to depend with absolute reliance upon the certainty and efficiency of this device to arouse his attention and save him from a collision with the bridge in passing under it. Consequently, they hold that his failure to heed and remember the warning given him by his fellow-servant, and his failure to see the bridge when within a short distance of it, with his face turned towards it and the bridge distinctly visible to one who, in his position, would only exercise the ordinary faculty of seeing, did not necessarily constitute such contributory negligence on his part as would defeat a recovery by his widow for his homicide, but would only present a question for determination by the jury. In this connection they lay great stress upon the decided trend of judicial opinion that railroad companies should be held strictly responsible for injuries to their employees caused by "man-traps" in the shape of low bridges, and that employees may be excused from exercising further precaution than availing themselves of the means which the railroads themselves provide for averting injury and death from such sources. See Shear. & Redf. on Negl. §198 *et seq.* They say the important matter was the exciting of the attention of the brakeman at the proper time, and that the company, by putting this "telltale" where it was, fixed the proper time and place for his attention to be aroused, and it was its duty to keep the "telltale" in proper order for that purpose, and the brakeman had the right to expect

that his attention would be aroused, and he be thus put upon his guard, by this very means and at this very place. With reference to the evidence showing that after passing the "telltale" and being within sixty feet of the bridge, the deceased stood with his face turned towards it, they urge that while, to all appearances, the brakeman might have been looking in the direction of the bridge, he may not have actually seen it by reason of his attention for the moment being relaxed, and it was a question for the jury whether, under all the circumstances, the failure of the company to keep the "telltale" in proper repair was not the real cause of the injury. The foregoing, as I understand it, briefly sets forth the views entertained by my brethren as expressed to me in our consultation about this case, and when it was agreed that I should state in this opinion the views of each member of the court.

I cannot yield my own positive conviction that the evidence in this case shows conclusively that the deceased was guilty of gross contributory negligence, and that consequently a recovery against the company was entirely unauthorized by law. I agree with my associates that the deceased was entitled to a warning, at a proper time and place, of approach to the bridge ; and that in the absence of anything to specially direct his attention thereto, he would not, as matter of law, be chargeable with contributory negligence in failing to discover his danger. I do not, however, agree with them that such warning was wanting in the present case. But a few minutes before, and when within a distance of only three or four hundred yards from the bridge, his attention was directly called thereto by a fellow-employee, and he was warned to look to his own safety rather than to the duty of carrying the bell-cord over the train to the engine, which might well have been postponed until after this dangerous obstruction was

passed. There is no doubt as to his hearing and comprehending this warning, for the evidence shows that he answered "all right" and proceeded at once, before the train started from the station, to act upon the advice given him, and as matter of fact, had fully accomplished this duty before the bridge was reached. So far as appears, no additional duty then devolved upon him, save that of looking after his own safety, and this duty he owed, not only to himself, but to the company as well. Nothing intervened to divert his attention, and it is incredible that, in so short a space of time, he could have forgotten a warning which so closely affected his welfare. He stood facing an obvious danger, to avert which he was only called upon to use his ordinary powers of vision. Why he failed to exercise this common precaution is not open even to conjecture. He was not, at the time, engrossed in the performance of any special service falling within the line of his duty; was not engaged in conversation; and so far as the record discloses, his attention was not momentarily distracted, or his vigilance relaxed, by even so trivial an occurrence as the flight of a bird. Not a single fact or circumstance was offered in his justification as constituting an excuse for his inexplicable heedlessness, and failure to exercise for his self-preservation the common faculties bestowed upon him by his Creator. Had the company ruthlessly exposed him to danger by demanding of him a service which required haste, which engrossed his entire attention, or which must needs be performed in a position from which he could not readily have observed approach to the bridge, the case would have presented entirely different considerations. Doubtless, some reason must have existed why this unfortunate man was unable to avoid the calamity, but what that reason was does not appear, nor can one with any certainty conjecture. The company may have been negligent in failing to keep in

proper repair the " telltale " in question, but the deceased could not complain of this, as he received ample warning from another source, not too long before he reached the bridge, and yet in time to have acted upon the same, and thus have avoided injury by simply employing his ordinary powers of observation. So far as any right to recover is concerned, the plaintiff stands precisely in his shoes. I do not think that if this brakeman had been injured instead of being killed, and had sued for the injury received under such circumstances, he could admit the warning from his fellow-employee above indicated, and that having fully performed the immediate duty with which he was charged, he was, at the time when injured, standing with his face in the direction of and within full view of the bridge; and, offering no excuse whatever for his failure to observe and avoid the obvious danger which immediately confronted him, with any show of reason or justice insist upon a right to recover.

The cases of Wallace *v.* Central &c. R. R. Co. (N. Y.), 33 N. E. Rep. 1069, and Pennsylvania Co. *v.* Sears (Ind.), 34 N. E. Rep. 15, and authorities cited, will be found interesting in connection with the question involved in the case at bar. In the former, Earl, J., refers to the case of Williams *v.* Railroad Co., 116 N. Y. 628, 22 N. E. Rep. 1117, in which it was held that a brakeman who, knowing he was approaching a low bridge, turned his back to it, was guilty of contributory negligence; and although the learned judge characterizes it as a " border " case, decided against the plaintiff by a divided court, in my opinion the decision was exactly right, and upholds my position that in the case at bar the brakeman, by disregarding the warning given him just before his train started towards the bridge, and by failing to observe the bridge when it was in full view immediately before his eyes, was guilty of the most in-

excusable contributory negligence. I find nothing in either of the above mentioned cases, nor in any of the cases they cite, so far as I have had time to examine them, which conflicts with the views herein expressed. As I stand alone, however, in the position thus taken, the opinion of the majority of the court must prevail, and the judgment is accordingly *Affirmed.*