28, 29.  KING *v.* SEABOARD AIR-LINE RAILWAY, and

*vice versa.*

1. In a suit by an employee against a railway company, for an injury received in the running of the cars, where the negligent thing complained of existed independently of the acts of the plaintiff or of a fellow-servant, a presumption arises, upon proof of the injury having been so received, that the company was negligent and that the plaintiff was not at fault.

2. A servant may recover from his master for an injury occasioned by a dangerous instrumentality negligently maintained by the master, although it appear that the servant was not ignorant of the existence of such dangerous instrumentality, if it is shown that at the time of the injury the servant was rendered oblivious or otherwise incapable of exercising his information as to the existence of the dangerous thing, on account of the engrossing character of the work at hand or other excusing circumstances brought about by proper attention to duty, and not by his own carelessness. The requirement in the Civil Code, § 2612, that "it must . . appear that the servant injured did not know and had not equal means of knowing such fact, and by the exercise of ordinary care could not have known thereof," is subject to the foregoing limitation.

3. Where the railway company by which the servant is employed uses the tracks of another railway company for the operation of its trains thereon, the former company is liable to its servant for injuries received by him on account of a negligently constructed low overhead bridge, spanning such tracks, without "telltales" or other means of warning.

4. An amendment to the petition, which merely varies the acts of negligence, but which does not complain of any different wrong or injury from that set forth in the original petition, is not subject to the objection that it sets forth a new cause of action.

Action for damages, from city court of Atlanta—Judge Reid. April 17, 1906.

Argued January 10,—Decided January 29, 1907.

*W. R. Hammond, Andrews & Skeen,* for plaintiff.

*Brown & Randolph,* for defendant.

POWELL, J.  King brought suit against the railway company for personal injuries received by him pending his employment as a brakeman.  He was hurt, by being struck by an overhead bridge, at Magnolia-street crossing in the city of Atlanta.  This bridge was located over a part of the tracks of the Western & Atlantic Railroad Company, which were being used by the Seaboard Air-Line Railway in reaching its freight depot, in the center of the city, from Howell's station, three or four miles away.  There were no "telltales" or other means of giving warning of approach to the

bridge. The train was made up by the crew, including the plain-
tiff, at a point near the bridge, and among the cars was inserted
an unusually high foreign furniture-car. It was necessary, in
order to prevent injury to the wheels, that as soon as the train was
put in motion the brakeman should instantly mount the cars and
release the brakes. The conductor having given orders for the
train to go, the brakeman transmitted the signal to the engineer,
and, as the train started, mounted the cars and began to loosen
the brakes which had been made fast on all the cars. He first
turned off the brakes on the car next to the engine and started to
the second car, running as he went; and as he approached the brake
at the further end of that car, which was the high furniture-car
above referred to, he was struck on the back of the head and neck
by the bridge and knocked to the ground, where he was further
injured by the train. The plaintiff had been in the employment of
the defendant company as a brakeman for about ten months, and
had been in the particular employment which required him to
pass under this bridge for about ten days. The plaintiff further
stated, that in passing under this bridge previously, he had ducked
his head, and that he had seen the other employees of the company
do the same. He had passed under the bridge in coming into the
city that day. The injury happened about ten o'clock in the morn-
ing on a fair day. In explaining why he did not notice the bridge
so as to prevent his being hurt, the plaintiff, who was a witness in
his own behalf, said: "I got up on top of the car and released the
brakes. When I got on the second car I had to make a step up
of something like two or three feet. I kept going back until the
bridge struck me. My back was towards the bridge all the time.
I was in a hurry to get back and suppose I never looked at the
bridge. If I had turned clear around I would have seen the bridge.
I would not have seen it if I looked to the right or the left.
It is a very long bridge. If I had got right down under there I
could have looked to the right or left and seen it. I knew there
was a Magnolia-street bridge, but I wasn't thinking about it at
the time. My mind was on my work, and it was on my mind alto-
gether. I was thinking about what I was doing, and not a thing
else. . If I had been thinking about the bridge and hadn't turned
my back, and had ducked my head like I had always done, I would
have passed under it. . . When I started out that morning I

was in a hurry to let these brakes off. It was the rule to hurry all the time, the quicker the better. I don't remember that there was any imminent collision with us at the time; it seems that we were in a hurry for something. It was just the rules to always get them off as quick as you can. As well as I remember, it was like it always was. I don't remember anything special. The rule was always to be in a hurry in taking off brakes. It was the same as any other day I suppose. There were no 'telltales' out there on the W. & A. tracks that were used by the Seaboard Air-Line and had not been since I had been working there. . . After I got up to the train I climbed right up to the side of the car next to the engine. I was in a great hurry, with my mind on my work. It was the usual rule to be in a hurry to take off the brakes, and I took them off as quick as I could. An ordinary freight-car is something like from 32 to 36 feet long. I was struck before I let the second brake off. That is right as near as I can remember. I suppose it took something like five or ten seconds after I left the first brake before I could get to the second. . . I didn't think about the bridge at all. You asked me yourself if I wasn't nearer the bridge than I thought I was, and I say 'yes, sir,' but the bridge never entered my mind. What I meant, by saying that I was nearer the bridge than I thought I was, was this: The space from where I got on the car to the bridge, after going back and looking at it after getting out of the hospital, the first place I went—I went to look at the distance from the switch to the bridge, and it was not as far as I had an idea it was; while I didn't think at the time I was at work, that is how I came to say that. I went down on the bridge and looked from the bridge up to the switch-point. While I was in the hospital I got to studying how far it was from there. I found that it was nearer than I thought it was while I was in the hospital. I just looked at it from the bridge. I never thought about the distance when I was at work; it never entered my mind; I was thinking about my work. I was busy, and never thought about the bridge. After I got out of the hospital I went to look at it and from the bridge up to the switch-point; it appeared to be a great deal nearer than it seemed in thinking it over. I said 'I knew there was a Magnolia-street bridge. I didn't know I was so near to it. I didn't know I was in the neighborhood of it, I thought I was further from it than I was.' . . I am not deny-

ing anything.  I tell you I didn't think about the bridge.  It is true that I walked upon the car and didn't turn around and look, because the bridge didn't enter my mind.  Anybody knows that I would not walk up and let the bridge knock me off, if it had entered my mind.  I was thinking about what I was doing; I didn't have my mind on one thing else."

The petition alleged, as ground of negligence, the breach of defendant's duty to plaintiff, in that it failed to see, before allowing the train, on which petitioner was employed, to pass under the bridge, that the same was a sufficient distance from the track for the body of petitioner, located as he was, to pass thereunder in safety; also, that it failed to see that all proper and sufficient "telltales," guard ropes, or other devices were placed at a safe and sufficient distance from the bridge to put petitioner on notice of the approach thereto, so that petitioner could have protected himself from coming in contact with the bridge.  By an amendment the plaintiff alleged the following further ground of negligence: "After the train was made up, and it was starting towards Howell's station, your petitioner, in the discharge of his duties as brakeman, climbed the front end of the front car, next to the engine, the train being already in motion, and went back, along the top of said car, to let off the brakes.  It was necessary for him to make great haste, for the reason that the brakes were on and the train had started to move, and it was not only his duty to release the brakes, but to do it as quickly as possible.  For this reason he hurried up the front end of the car, and hurried along the top of the first car and hurriedly let off the brake on that car, and then made as much haste as he possibly could to pass on to the second car for the purpose of letting off the brake on that car, his intention being to then pass on to the third car, and let off the brake on that one.  So urgent was the necessity to let off these brakes quickly that your petitioner's mind .was completely engrossed and absorbed with the performance of that duty, and he was hurrying along the top of the second car, with his back towards the engine and the bridge which the train was approaching, when he was knocked off the second car, near the rear end, as set forth in his original declaration.  At the time he was knocked off, his mind was intent upon letting off the brakes on that car, to the exclusion of every thought about the bridge.  And your petitioner

avers that the car on which he was at the time he came in contact with the bridge was more dangerous than the ordinary freight-car; for the reason that it was considerably higher, which increased the danger to your petitioner of being struck by said bridge; and your petitioner avers, that neither before climbing upon said train nor while thereon did he receive any warning from the conductor of said train, or from any one else, of the increased danger of going upon the higher car, and that his mind was so engrossed and absorbed by the urgent necessity for releasing the brakes quickly that he did not think about or consider the fact of the increased danger, but was wholly absorbed in the performance of the duties of his position. Under these circumstances your petitioner avers that it was negligent in the defendant not to have warned your petitioner of the increased danger of the high car, and to have inserted said high car in the train without, at the same time, warning your petitioner of the increased danger therefrom. And your petitioner avers that the insertion of said high car in the train, and the failure of the defendant to warn him of the increased danger, was the cause of his being knocked off the same and receiving the injury as set forth in his original petition." To this amendment the defendant filed various grounds of demurrer. However, as counsel for the defendant, in their brief and argument, summarize these demurrers as raising the point "that the amendment set up a new cause of action, which was offered more than two years after the cause of action arose, and if it sets up a new cause of action it [the amendment] should not have been allowed, and one reason therefor would be that the statute of limitations had run," and as we find that this substantially states the matter correctly, we will not set the demurrers forth more elaborately. These demurrers were overruled. At the conclusion of the plaintiff's testimony, upon motion of the defendant, a nonsuit was awarded. This judgment the plaintiff in error in the main bill of exceptions brings up for review. In the cross-bill the defendants assign error upon the overruling of the demurrers to the amendment.

1. The negligence complained of in this action not being the act of a fellow-servant, nor being an act in the performance of which the plaintiff himself was engaged, it was not necessary for him to show affirmatively either that he himself was blameless or

that the railway company was negligent, further than to prove the fact of his being injured as stated in the petition; because the proof of such injury immediately raised against the company a presumption of negligence; and the plaintiff thereupon became prima facie entitled to recover, without further proof, unless his testimony established some defense which would defeat him. *Central R. Co.* v. *Kelly,* 58 *Ga.* 107 (5), 113; *Central R. Co.* v. *Kenney,* 58 *Ga.* 489; *Savannah Ry. Co.* v. *Day,* 91 *Ga.* 676 (2), 679.

2. It is not impossible, however, for a plaintiff, after casting the burden upon the defendant in such a case, to disprove his case, by showing affirmatively that, despite the presumption to the contrary, he himself was negligent or that the company was not, or by establishing some other defense, such as that the act of negligence was embraced in one of the known risks which, under the employment, he assumed. In determining the ultimate question of liability, recourse must, therefore, be had to the reciprocal obligations imposed upon the master and the servant by the contract of employment. These are tersely set forth in the Civil Code, §§2611, 2612. These code-sections are not statutory in origin, but are merely declaratory of the general law as it previously existed and must be construed accordingly. The fact of their being codified into the written law does not add to them any quality of exhaustiveness, but still leaves them to be construed in accordance with all the various exceptions, qualifications, and extensions to which the principles announced therein were subject before they were placed in the code. As is shown by Labatt, in the introductory statement to his most excellent work on Master and Servant, these doctrines, thus defining the extent of a servant's right to recover damages for injuries received by him in the course of the employment, represent the result of a compromise between the principle that the servant agrees to assume all the risks incident to the work undertaken by him, and the principle that the master is answerable for the consequences of any negligent acts which may be committed by himself or his agents. To quote from this same author, as he proceeds further with the subject: "A proposition which has so frequently been enunciated by the courts as to have become axiomatic is that, prima facie, a servant does not assume any risks which may be obviated by the exercise of reasonable care on the master's part. In other words, the abnormal, unusual, or

extraordinary risks which the servant does not assume as being incidental to the work undertaken by him are those which would not have existed if the master had fulfilled his contractual duties. . . A second proposition, which is also beyond the reach of controversy, is that every risk which an employment still involves after a master has done everything that he is bound to do for the purpose of securing the safety of his servants is assumed, as a matter of law, by each of those servants. This doctrine prevents recovery unless evidence is introduced which warrants the inference that the injured person was incapable of appreciating the risk from which his injury resulted."

It can hardly be questioned that a jury would be authorized to find that, as to a brakeman whose duties require his presence on the top of the cars, it is an act of negligence for a railway company to maintain across the tracks, without "telltales" or other efficient means of warning, an overhead bridge, so low as to strike employees passing thereunder. *Savannah Ry. Co.* v. *Day,* 91 *Ga.* 676 (1) ; *Stirk* v. *Cen. R. Co.,* 79 *Ga.* 495. These cases also hold that the question of the plaintiff's contributory negligence in such cases is for the jury, and is not to be resolved in the defendant's favor by a nonsuit. But it is contended that the plaintiff is precluded from recovery in the case, for that the master's negligence, in maintaining the low bridge, was one of the risks assumed by the servant, because he knew there was such a low bridge and knew where it was located. The theory that the servant's knowledge or ignorance of the dangerous instrumentality by which he is hurt determines the absence or the existence of culpability on the master's part has been the subject of much judicial decision, in each and all of its various phases. With unanimity of accord it is agreed, that if the servant knows, at the time of the injury, of the defect and of the danger, and is in mental position to be aware of both, the master is not to be held liable, whether the question be viewed from the juridical aspect of the servant's implied contractual assumption of the risk, or of his contributory negligence. Upon the extension of the rule to the case of a servant, who, although he has been possessed of actual knowledge of the dangerous condition brought about by his master's negligence, is for the time being deprived of the power to exercise that actual knowledge by reason of obliviousness, or by incapacity to appreciate the danger, or by

temporary forgetfulness, brought about by the engrossing character of the labor which his duty requires him to be performing at the time he is injured, the courts have taken widely divergent views. Many courts hold, with unwavering rigidity, that the servant's knowledge is fatal to his case, despite the fact that any other reasonable man, with a proper regard for his master's interests, would have been subject to the same injury under the same circumstances. Other courts hold that if the forgetfulness or the incapacity to realize the danger is excusable and is brought about by reason of proper attention to the master's business, the servant may recover.

In our judgment the state of the servant's knowledge should be considered as of the moment of the injury. We can not know a thing until our mind is capable of grasping it, and we no longer know it when our mind is incapable of retaining it. The knowledge on the part of the servant which precludes his recovery may be actual or constructive. If he knows of the danger, or if in the due exercise of his duty toward his master he ought to know it, the rule is the same. If on account of youthfulness or mental weakness the servant's mind is incapable of grasping the knowledge of the danger, though it be before his very eyes, the courts, with unanimity, hold that he has not assumed the risk; for the law will not put upon the young or weak mind the burden of grasping that which it can not grasp. It therefore seems reasonable to us to say that the law does not put upon any man's mind the burden of retaining that which it can not retain. If the failure to retain is through inattention to duty the servant is at fault, but if it is the result of attention to duty, of doing what he ought to do, the servant is not at fault. It is not more unreasonable to imply a constructive lack of knowledge in favor of the servant when attention to duty brings forgetfulness than it is to imply a constructive knowledge against him when attention to duty would bring such knowledge. Ordinarily an implied assumption runs with the servant's contract of employment, that he will obtain and retain knowledge of the risks incident to the employment, and that he will use that knowledge for the purpose of protecting himself. It is fair that a negligent failure on his part either to obtain, to retain, or to use such knowledge should prevent his calling upon the master for indemnity for an injury resulting from his own breach of his contract of employment as to these very things. On the other

hand, where the servant has done all that any one coming up to the law's standard of an ordinarily prudent man would have done, under the same circumstances, either to obtain, retain, or use such knowledge, and has not obtained it or does not retain it, a breach of the contract in this respect is not to be imputed to him; and if the injury results, not from accident, but from negligence of the master, he should be allowed to hold the master liable for the breach of the master's implied obligation in the contract of employment. The practical effect of the cases holding to the contrary is to maintain that the servant is required at his peril to exercise in some cases of this class—especially in just such cases as this of dangerous overhead bridges—a degree of skill and vigilance which, to borrow an illustration from Labatt (M. & S. 159), is equal to, if not greater than, that which was possessed by the pilot described in Mark Twain's "Life on the Mississippi," who, when his turn at the wheel arrived, even when he was aroused at the hour of midnight in the darkest and most tempestuous weather, was expected to comprehend, at a glance, the exact position of the boat, without any instruction from his predecessor at the post.

Moreover, the position we are now asserting is not without an abundance of able authority to support it. In addition to the Georgia cases of *Savannah Ry. Co.* v. *Day,* and *Stirk* v. *Central R. Co.,* supra, we cite: Kane *v.* Northern Central Ry. Co., 128 U. S. 91 (holding that it was for the jury, where the brakeman's necessary haste in getting to the brakes caused him to forget a known defect in a car); McGovern *v.* Oil Co., 11 App. Div. (N. Y.) 588 (sustaining verdict where brakeman was injured by an overhead beam of which he had knowledge, his attention being distracted by cries of a person near by); Wallace *v.* Railroad Co., 138 N. Y. 302 (holding that a brakeman on top of a moving train is not, as a matter of law, chargeable with negligence simply because he does not continually bear in mind the precise location of the train relatively to a bridge over the track); Chicago etc. Ry. Co. *v.* Goebel, 20 Ill. App. 162; s. c. affirmed, 119 Ill. 515 (holding that laborers have the right to become so engrossed in their labor as to become oblivious to the approach of trains, and that such forgetfulness will not preclude recovery); Harker *v.* Burlington etc. Ry. Co., 88 Iowa, 409 (quoting from 1 Shear. & Red. Neg. §213: "The mere technical fact of the servant's knowledge

of a defect is not sufficient to exonerate the master, if, for any reason, the servant forgets it, and is not at fault in forgetting it, at the precise time he suffers thereby." An urgent demand for speed on the employee's part is held as sufficient excuse for the forgetfulness) ; Brown v. New York etc. Ry. Co., 42 App. Div. (N. Y.) 548, s. c. affirmed, 166 N. Y. 626 (verdict sustained for a fireman leaning out of window, in performance of duty of watching movements of another train, struck by mail crane temporarily forgotten by him) ; Chicago etc. Ry. Co. v. Cleveland, 92 Ill. App. 308 (holding under the Illinois statute, which is substantially identical in terms with our Civil Code, §§2611, 2612, "that the term 'knowledge,' as used in defining assumed risks, means no more than that all the facts and circumstances surrounding the given case must be sufficient to charge the employee with the required information," and that a trainman struck by a flag shanty negligently located might recover despite his knowledge of the location, when his attention was distracted by the engrossing character of his duty at the moment) ; Northern Pacific R. Co. v. Mortenson, 63 Fed. 530 (a low bridge case) ; Mason & O. R. Co. v. Yockey, 103 Fed. (C. C. A.) 265 (question of whether fireman was negligent in forgetting the condition which caused him to be injured, he being engrossed in his duties, is for the jury).

We are content to close this discussion by adopting the views expressed in the same valuable treatise to which we have already referred so often in this opinion, Labatt's Master & Servant (p. 166), as follows: "A correct view of the situation, it is submitted, can not be arrived at, unless we wholly eliminate from the question the element of a freedom of will which has no existence, except in the imagination of a certain school of economists, and resort to first principles, for the purpose of ascertaining what standard of diligence is demanded from the employer by those large considerations of public policy, upon which, in the last analysis, the whole law of negligence may be said to rest. If we view the subject from this standpoint, all the difficulties of the subject will vanish. All that is necessary is to construe, in a manner appropriate to the relations of the parties to the contract of service, the principle that no person has a right to keep his property in such a condition that persons who, with his consent, are brought into close relations with it, will be likely to receive injury, even though they may exer-

cise all the care which it is justifiable to expect from them under the circumstances. If the degree of care which the servant must exercise in order to escape injury is greater than that which, considering the exigencies of the work, and other matters which are likely to divert his attention and produce a temporary forgetfulness of a known danger, it is reasonable to demand from men of average prudence and average powers of observation, then it may be fairly maintained that the master ought to bear the responsibility of any accident which may occur, quite irrespective of the question whether the servant was or was not aware of the nature and extent of the danger. The acceptance of this principle would not involve any very startling changes in the law as we now have it. It would merely require us to fix the standard of care incumbent on the master, with a view to the consideration that, as the implied agreement of the servant is merely that he will use ordinary diligence in the discharge of his functions, it is a breach of duty in the master to keep his instrumentalities in such a condition that ordinary diligence will not always save the servant from injury. A rule formulated upon this basis would not make the master an insurer, nor would it necessarily render him liable simply for the reason that his appliances were old and imperfect. It would merely make his liability dependent upon whether he had or had not acted unreasonably, and therefore negligently, in holding out inducements to do work which, at certain conjunctures not unlikely to arise, could not be performed safely without the exercise of a degree of care which no fair-minded, considerate person would demand from a servant. Such a rule would not impose any burden upon the employer which a just and sensible man would be unwilling to bear, and would effectually prevent that cruel abuse of the doctrine of assumption of risks, which has done so much to embitter the feeling with which capitalists are regarded by the working classes."

It may be proper for us to distinguish this case from the cases of *Blackstone* v. *Cen. Ry. Co.,* 112 *Ga.* 762; *East Tenn. Ry. Co.* v. *Head,* 92 *Ga.* 723; and *Price* v. *Cen. Ry. Co.,* 124 *Ga.* 899. In none of these cases was the decision upon this precise point. In the case of *Blackstone,* who was hurt by being struck by a pole located too near the track, it was shown that he was yardmaster, and not only under the duty of knowing the location of the pole,

but also of warning other employees. *Head's* case turned on the point that he was not acting under emergency, and that he carelessly took an unsafe time and place to look out from the engine, whereby he caused himself to be struck by a post of which he had full knowledge. In *Price's* case the question of forgetfulness or obliviousness, caused by attention to duty, was not involved. Even if there be, in the reasoning upon which any of these cases are based, anything in conflict with the rule which we are here announcing, we feel justified in relying upon the older decisions in *Savannah Ry. Co.* v. *Day* and *Stirk* v. *Railway Co.*, supra. These cases clearly recognize that the servant may forget, and that to guard against this forgetfulness, the company ought to erect and maintain "telltales." The "telltales" would arouse him from his obliviousness and he would be able to escape injury. *Simmons* v. *Railway Co.*, 92 *Ga.* 658, is akin to the present case in basic principles; and in that action a recovery by the servant was held to be authorized.

3. It is insisted by the defendant that since the track which was being used was the property of the Western & Atlantic Railroad Company, and not of the defendant, the former company alone would be liable for the injury. Unquestionably the allegations of the petition set forth a cause of action against the Western & Atlantic Railroad Company. It is also true that in most of, if not in all of, the cases in the Georgia Reports, where employees of one railway company have been injured by the defective condition of another railway company's tracks, roadway, etc., which were being used under an arrangement between the two companies, the suits were instituted against the company owning the tracks, etc., and not against the company sustaining the relation of master. This is probably due to the fact that more defenses are open to the master company than to the other. However, the right to sue the company owning the tracks, etc., is not exclusive. As was said by Chief Justice Bleckley, in *Ellison* v. *Georgia R. Co.*, 87 *Ga.* 722, under a similar state of circumstances: "Far more reasonable would it be to treat both the negligent parties as wrong-doers, and make them both answerable for the result to which they mutually contributed, than to excuse one of them because the other was also at fault." The master's duty to furnish a safe place to work is absolute, and he can not shift this responsibility. The well-con-

sidered case of Story v. Concord etc. R. Co. (N. H.), 20 Am. & Eng. R. Cas. (N. S.) 90, is directly in point. There is some conflict of opinion in the decisions of the courts of the different States, as to this question, but we adopt the above as the sounder view.

We have not overlooked the contention of the defendant that the evidence as to the fact that the tracks belonged to the Western & Atlantic Railroad Company and were leased by the Seaboard Air-Line Railway is hearsay, and therefore of no probative value. An inspection of the evidence set out in the record does not sustain this contention. That there was a lease of the tracks by the latter company from the former appears to be sustained only by hearsay, but the proof was direct that the tracks belonged to the Western & Atlantic Company and that the Seaboard Company was using them for the operation of trains. This alone is material, the exact nature of the agreement by which the use came about is not so.

4. The judgment complained of in the cross-bill was not erroneous. *City of Columbus* v. *Anglin,* 120 *Ga.* 785 (6); *Colley* v. *Gate City Coffin Co.,* 92 *Ga.* 664.

*Judgment, on the main bill of exceptions, reversed; on the cross-bill, affirmed.*