### 1257.   BROWN *v.* ROME MACHINE AND FOUNDRY COMPANY.

1. One of the non-delegable duties of a master is to furnish an adequacy of competent servants to do the work in hand.
2. An action brought by a servant against his master, for damages resulting from personal injuries received through a breach of one of the master's duties under the relationship between them, presents a case of tort in which the broken duty "flows from relations created by contract." In such cases the duty and the right of action for its breach are modified by the terms, express or implied, of the underlying contract.

   (a) Every contract is enforceable to the extent not only of its express terms, but also of its connotations.

   (b) Under the usual contract of employment, the law raises an implied warranty on the part of the master that he will keep and maintain the place of work and its appurtenances free from hidden dangers, so far as he knows of them or, in the exercise of ordinary diligence, can anticipate or discover them; similarly it implies an agreement on the part of the servant to assume the risk of such dangers as are within his knowledge, or as he can discover and foresee by the exercise of ordinary care.

   (c) Assumption of risk, when pleaded to an action ex delicto by a servant against a master, is a defense growing out of the contract which gave existence to the relationship on which the action is based.

   (d) Viewed as the basis of an action ex delicto by the servant, "the duty of a master to use ordinary care to keep his premises and to conduct his business in such manner that his servants may perform their

duties in safety is but a phase of the broader and more anciently recognized doctrine of the common law that every person who expressly or impliedly invites another to come upon his premises or to use his instrumentalities is bound to use ordinary care to protect the invited person from injury."

3. The fact that the plaintiff, by his own negligence, contributed to bringing about the injury which he claims to have received through the negligence of the defendant is always a good defense to an action ex delicto. Contributory negligence does not relieve the defendant by denying the wrongfulness of his conduct or omission, but by so inculpating the plaintiff that the courts, through motives of public policy, raise a barrier against him.

4. The assumption of the risk by the servant is a matter purely of contract, and is governed by the canons of contract. Contributory negligence is a matter relating solely to torts, and is governed by the principles peculiarly applicable to that branch of jurisprudence.

5. Assumption of risk, being contractual, implies choice and freedom of consent. Before choice can be implied, there must be an opportunity to choose.

(a) Where the allegations of the petition show that the plaintiff was placed in a dangerous emergency by a sudden negligent act of his master, and was injured, it will not be adjudged, on demurrer, that he assumed the risk of continuing to work in the face of this increased hazard, when it appears that the injury followed so quickly upon the negligent act that he did not have a fair opportunity of reasonably exercising any choice in the matter.

6. The question of the plaintiff's contributory negligence is, under the allegations of the petition, issuable and solely for the jury.

Action for damages, from city court of Floyd county—Judge Hamilton. June 8, 1908.

Argued July 17,—Decided November 10, 1908.

The petition as amended alleged substantially as follows: Plaintiff was, when injured, an employee of the defendant, in the capacity of an apprentice moulder, whose duties were the same as those of a moulder, except that the class of work is not as good, for the reason that he was learning the trade. He did learn the work of making forms, poured and carried iron, and did similar work in the defendant's foundry at which castings were made. The plaintiff, with two other men, was carrying molten iron in a ladle and pouring it into a flask, for the purpose of making a casting. The ladle was an iron bucket, about eighteen inches high, and about ten inches in diameter inside. "It is suspended in the middle of an iron rod, which is a pole about four feet long at one side of the bucket, and at the other a pair of shafts extending about 3 feet from the bucket. The general appearance

of the flask is a box 3½ feet high, 6 feet wide, and about 10 feet long." The weight of the casting being made was about 1,800 pounds. As the plaintiff and the two men were about to carry the ladle to the flask, the defendant's foreman in charge, W. A. Duncan, called one of the men with the plaintiff away from the work, and put him at other work, directing the plaintiff and his other helper to carry and pour the iron, as they had started to do. Duncan was in direct charge of the room in which the plaintiff was working, and directed all of the men in the foundry what work to do. He was the immediate superior of the men in the foundry and superintended the work therein. The ladle was full of iron, and the plaintiff and the two men had picked it up by means of the pole and shafts above mentioned. The plaintiff was behind between the shafts, holding them in his hands, and the other two men were in front, one on each side of the pole. This ladle of iron was to be carried to the flask, a distance of about twelve feet, and poured into the flask on top of molten iron already poured; and Duncan, after calling one of the men, ordered the plaintiff and his helper to proceed. This the plaintiff and his helper undertook to do; and, while so doing, the helper became overbalanced by his load, and the ladle struck against the end of the flask and splashed some of the molten iron into the plaintiff's left eye. The helper became overbalanced by reason of the weight he was carrying by the pole; which, as it had to be carried to one side of him, had a tendency to disturb his balance. By reason of being overbalanced, the ladle swung out from him against the side of the flask, and struck against the flask, and the impact caused the iron to splash as aforesaid. The ladle weighs about 100 pounds, and holds about 300 pounds of molten iron. The ladle should be and is intended to be carried by three men. On account of the weight of the ladle and its contents, and the dangerous character thereof, it should always be and is customarily carried by three or four men. The business of carrying and pouring molten iron has to be conducted rapidly, to prevent the iron from cooling and solidifying. The defendant was negligent in failing to furnish a sufficient force to conduct the work with reasonable safety. The plaintiff was free from fault or negligence in and about the transaction, by reason of the facts stated. He was working under the immediate orders of a superior foreman, was in the line of his

duty and scope of his employment, and was intently engaged in his work, which had to be conducted with great rapidity, as aforesaid; so that he did not have time to, and did not, realize the risk and danger of performing the work with only two men as aforesaid. By reason of the rapidity of action required, he was acting in an emergency, and did not assume or understand the increased hazard of the work. The defendant was negligent in increasing the hazard and risk of the plaintiff's employment, without due warning, and without giving him time to realize the increased danger. The injury is the direct and proximate result of the defendant's negligence hereinbefore alleged. The judge sustained a general demurrer, and the plaintiff excepts.

Seaborn & Barry Wright, for plaintiff.

Smith, Hammond & Smith, Dean & Dean, for defendant.

POWELL, J. (After stating the facts as above.)

1. As originally drawn, the petition was subject to dismissal on demurrer. It did not show a cause of action. It merely alleged that at the time one of the two necessary helpers was called away, the plaintiff and his fellow laborers were about to carry the ladle of molten iron to the flask, not that they were already in the act of carrying it. As thus set forth, the transaction was clearly covered by the cases of Worlds v. Ga. R. Co., 99 Ga. 283 (25 S. E. 646), and Freeman v. Savannah Electric Co., 130 Ga. 449 (60 S. E. 1042). It would also be easily distinguishable from the case of King v. Seaboard Air-Line Railway, 1 Ga. App. 88 (58 S. E. 252) ; for it could fairly have been said that the plaintiff, with no other emergency before him than that the ladle was ready to be moved, with no other duty to claim his care than the doing of the very work by which he was injured, with no other engrossing task claiming his attention so as to distract it from an appreciation of what was involved in the act he was about to attempt, assumed the danger by going forward with the work, knowing that one of his fellow workmen had been called away.

The amendment states that the necessary third man was called away after the three were already in the very act of carrying the ladle full of hot molten iron. This presented an emergency. It puts the case where we can not say that the plaintiff, under his duty to his employer, or under that duty to use ordinary care and diligence for self-protection which the law imposes on every man

when confronted with another's negligence, should have attempted
to rid himself of the dangerous emergency by putting down the
ladle just as the third man turned it loose, instead of going on to
the flask with it; which means, of course, that we can not say that
the plaintiff either assumed the risk or was guilty of contributory
negligence.

It is well recognized now that one of the non-delegable duties of
the master is to furnish an adequacy of competent fellow servants
to do the work in hand. Labatt, Master and Servant, §573;
*Cheeney* v. *Ocean Steamship Co.,* 92 *Ga.* 726, 728 (19 S. E. 33,
44 Am. St. R. 113) ; *S., F. & W. Ry. Co.* v. *Goss,* 80 *Ga.* 524 (5 S.
E. 777) ; *Moore* v. *Dublin Mills,* 127 *Ga.* 610 (56 S. E. 839, 10
L. R. A. (N. S.) 772) ; *Dennis* v. *Schofield,* 1 *Ga. App.* 487 (57 S.
E. 925). The petition alleges such a delinquency on the part of
the master as an efficient proximate cause of the injury; and,
therefore, the case turns upon the question whether the risk was
assumed by the servant and whether he was guilty of contributory
negligence.

2. Our young friend who has presented the case for the plain-
tiff in error frankly confesses his inability to distinguish between
the defenses of assumption of risk and contributory negligence, in
master and servant cases. Perhaps the very simplicity of the dis-
tinction has confused him. The statement of homely facts in
technical terminology frequently confuses. In my earlier days,
when I was an attaché of a newspaper office in my home town,
with that facetiousness which is not always unbecoming to the
journalistic craft, I contributed an article stating, with much cir-
cumstantiality of detail, that on the western edge of the county
might be found a large quantity of a very valuable substance
known as protoxide of hydrogen, "an article largely used in the
arts and sciences and almost indispensable to navigation." Local
real estate men and capitalists suffered the keenest curiosity until
they discovered that protoxide of hydrogen is mere water, and
that the large quantity referred to is the Chattahoochee river. The
meaning of the two expressions, "assumption of risk" and "con-
tributory negligence," and the distinction between them, are sim-
ple, though the application to particular cases is frequently diffi-
cult.

The relation of master and servant arises through a contract

made for the common benefit of both parties. The business of getting the work done is the master's; the business of getting the work to do and of doing it is the servant's. Each expects to get a benefit. So they contract that the master will have the work done and that the servant will do it. Every contract has implied obligations, in addition to those which are express; and the contract between the master and the servant is no exception. If a retail merchant in Atlanta makes a contract with a wholesale merchant in New York for a bill of goods, and nothing is said expressly as to how they are to be shipped, the law finds in the contract, in addition to the express language, certain connotations; for instance, that the goods are to be shipped by the usual means of transportation, and that the carrier shall be the purchaser's agent to receive them from the seller. In sales, if the parties omit the expression of the terms of warranty, the law implies certain terms. These implied obligations and assumptions which the law adds to the express agreements in all contracts are familiar to lawyers and laymen alike; they are simply inferences which the courts draw from the transaction, on the ground that the parties naturally must have intended them. When the relation of master and servant is about to arise, the parties usually agree expressly as to what work shall be done by the servant, and what pay he shall receive. The law adds other things by implication. Nothing to the contrary being expressly said, the law presumes, in usual cases, that the parties intend to agree that the master shall furnish the place to work, the fellow workmen, the thing on which the work is to be performed, and the machinery, tools, and other necessary instrumentalities, and, if the work is a part of a complex system, that the master will organize and maintain the system. If the servant is contracting in ignorance of the actual condition of these things, he is authorized to infer that the master's place of work and system are safe, so far as ordinary care and diligence could make them so, and that the master will use the same degree of care to keep them so. He has the right to make the same inference as to the competency and number of fellow servants furnished, and as to the tools, machines, instrumentalities, etc., with which he is expected to come into contact in doing the work. It would be a prima facie violation of the master's contract of employment if he offered to put a servant, who had contracted in ignorance

of actual conditions, to do work which was unsafe by reason of the system organized or maintained, or of the condition of the place,, ways, instrumentalities, etc., if by ordinary care on the master's. part they could be made reasonably safe. Confronted with the proposition of being required to work under an unsafe system, at an unsafe place, with incompetent fellow servants, or with unsafe instrumentalities, the servant would have the right of abandoning the contract and suing the master for breaching it as to this material, though implied, portion of it. However, if he knows. the actual condition of things, when he contracts, or if he subsequently discovers it, he may not choose to refuse to work; the doing of the work may be such a privilege that he is willing to take the chances of getting hurt, so that he in the one case, by actually contracting with knowledge of the danger, or in the other case, by refusing to abandon after knowledge, and thereby waiving the master's breach, raises an implied agreement against himself that he will not hold the master to the obligation of furnishing any safer place, ways of work, servants, or appliances than what already he sees to exist,—or, as we say in juridic terminology, he assumes the risk of the delinquencies,—and thereafter the law reads this implied agreement or assumption on his part into the contract of employment, as a part of it.

The contract of employment being one of mutual benefits, the servant's assent and consent to work with a defective instrumentality of his master gives the transaction very much the same color as if the servant were expected to use one of his own tools—as is sometimes the case, and he himself should bring one that is defective. Let us get clearly fixed in our minds just here the idea. that the subject-matter of the contract between the parties (the doing of the work in contemplation) is one in which the servant has a proprietorship, so to speak, as well as the master; he is engaged in the business of laboring, just as the master is engaged in the business of having labor done; the master's plant, tools, etc., are instrumentalities which he (the servant) adopts and contracts for as a part of the occupation he wishes to carry on—the occupation of working for reward. If he were working for himself and not for a master, he would have the legal right to buy defective tools. or use an unsafe workshop of his own. So, too, he has the similar legal right to make a contract to work for his master in which he under-

takes to use the master's defective tools or to work in the master's unsafe plant. So far as the procuring of instrumentalities and place of work are concerned, the laborer's choice and his right to hold some one else responsible for defects are decidedly similar in the two cases—whether he buys the tools, machines, etc., or procures them as a part of his contract with the master. If he is working for himself and buys his tools, machinery, etc., in the usual market, he can not hold the one who sells them to him liable for injuries arising from the fact that they are defective, if they are bought or accepted as imperfect; nor can he hold the seller liable, · even though they are bought under such circumstances that the law raises an implied warranty, unless they contain hidden defects which the seller knew or, from his opportunities for discovery, should have known, and which the buyer did not know and in the exercise of reasonable diligence could not discover. It is only upon similar conditions that he could maintain liability against a contractor who had built a workshop for him; he could not recover for injuries from defects, unless they were hidden and the contractor knew or ought to have known of them, and he (the assumed plaintiff) did not know of them and by ordinary diligence could not discover them. Likewise, when the laborer, instead of working for himself and buying his tools, machines, house, etc., makes a contract with his master, and as an implied incident to that contract procures the house, plant, fellow servants, tools, machines, and other instrumentalities necessary to the doing of the work, this contract gives him no higher theoretical right as to the condition of these things than he would have if he had obtained them under a contract of purchase. Hence we say that the servant can not recover from the master for injuries arising from defects in those things which, under the law, the master is to furnish as a part of his contract, unless the master knew or ought to have known of the defects, and unless the servant did not know and by the exercise of ordinary care could not have known thereof. Assumption of the risk—that is to say, the risk of using the master's works, ways, servants, instrumentalities, etc., in the condition in which the servant knows, or, by ordinary care, should know them to be, is a contractual incident implied by the law from the very nature of the contract itself. Being a contractual implication, it may be destroyed by an express agreement to

the contrary, or even by a repugnant implication arising from particular extraordinary transactions or communications between the parties. For an example and a discussion of this phase of the question, see *Bush* v. *West Yellow Pine Co.*, 2 *Ga. App.* 295 (58 S. E. 529).

The action of the servant against the master for injuries received through defects in the latter's work, ways, means, instrumentalities, etc., however, almost invariably sounds in tort. It is elementary that a broken duty arising from a relation created by contract may furnish the basis for an action ex delicto. See Civil Code, § 3807, par. 3, § 3810; *L. & N. R. Co.* v. *Spinks*, 104 *Ga.* 692 (30 S. E. 968). In such cases the contract tends to assist in defining the duty, and frequently limits it or the right to sue for a breach of it, when otherwise there would be no such limit. This principle, that a right of action ex delicto because of the breach of a duty springing from a contractual relationship is subjected to the terms of the contract, is familiar. For example, when a member of the public makes with a telegraph company a contract for the transmission of a message, a relationship arises between the parties and a public duty on the company's part attaches to the transaction; and for the breach of this duty a cause of action ex delicto exists, but it may be modified or defeated by the terms of the underlying contract; as, for instance, by the usual stipulation that immediate notice of the damages shall be given, and that no suit shall be brought except within a limited period of time.

The prime gist of the servant's action against the master is very much akin to that in cases where an invited visitor comes upon the premises of another. "The duty of a master to use ordinary care to keep his premises and to conduct his business in such manner that his servants may perform their duties in safety is but a phase of the broader and more anciently-recognized doctrine of the common law that every person who expressly or impliedly invites another to come upon his premises or to use his instrumentalities is bound to use ordinary care to protect the invited person from injury." *Seaboard Air-Line Railway* v. *Chapman*, 4 *Ga. App.* 706 (62 S. E. 488). The law implies an invitation from the landowner to come upon his premises, as to every one with whom he has such business relations as to warrant such an implication. *Mandeville Mills* v. *Dale*, 2 *Ga. App.* 607 (58 S. E. 1060). We

have shown above that the servant has such an interest in the very doing of the work as to entail responsibilities and assumptions upon him; the master also has an interest in the same subject-matter. The rule that an invitation to use the proprietor's premises, instrumentalities, etc., will be implied, where he assumes such a relation as to make that use a benefit contemplated by him in assuming the relationship, is of direct application when a master hires a servant. See the quotation from Sweeny v. Old Colony R. Co., 92 Mass. 373 (87 Am. D. 644), in *Mandeville Mills* v. *Dale,* supra. Whenever such an invitation is implied, the principle contained in the Civil Code, § 3824 (a common-law principle), becomes applicable, and the law raises against the proprietor immediately the duty that he shall have and maintain his premises, instrumentalities, etc., in a safe condition for the purposes contemplated, so far as ordinary care and diligence on his part will keep them so. It is therefore usually stated in general terms that the master owes to the servant the duty of using ordinary care to see that his plant is safely kept and maintained, so far as system and place of work, instrumentalities, competency, and adequacy of servants and other appurtenances to the doing of the labor are concerned. This duty, springing as it does from a relationship arising by contract, is modified and limited by the terms, express and implied, of the contract itself. Hence assumption of risk is always a good defense to a suit for a breach of this general duty, whenever, according to the contract and the implied obligations which the law reads into it, the servant has assumed the risk of working in or with the thing that has caused his hurt.

3. We come now to the defense of the servant's contributory negligence. It is a rule of the common law, of almost universal application, that a plaintiff loses his right to claim damages (except in cases where the statute provides for a diminution only and allows a comparison of the negligence of the respective parties), if it appears that his own negligence contributed to the bringing about of the injury, notwithstanding that negligence of the defendant may be shown also to have been a proximate cause. Contributory negligence may consist in the plaintiff's knowledge, or careless ignorance, of existing conditions likely to subject him to risk of danger. Hence in cases where the servant has entered the employment knowing that an unsafe condition exists, or continues

to face the danger when he has discovered it, or in the exercise of ordinary care should have discovered it, not only is assumption of risk a good defense, but contributory negligence would be also. There are cases where, under the contract or under some mutual abrogation of the usual terms, the servant has not assumed the risk, or has been relieved of it; and in these cases, though the defense of assumption of risk is not open to the defendant, the defense of contributory negligence may remain so; for the defense of contributory negligence is a barrier which the law itself has raised, as a part of public policy. It is the law itself that closes the door of the courts to those who by their own carelessness have occasioned their own hurt, though the defendant sought to be held liable may also have been at fault. *Bush* v. *West Yellow Pine Co.,* supra. It is, of course, contributory negligence for a person to fail to use ordinary care to avoid the consequences of another's negligence, when it becomes apparent. A risk may arise which the servant can not fairly be said to have assumed and which he in nowise contributed to bringing about—a risk, however, in which the servant might extricate himself from danger, if only he should use ordinary care. In such a case, if he fails to use that care, and is hurt, the defense of contributory negligence is applicable, though the defense of assumption of risk would not be.

4. The foregoing discussion is elementary and not comprehensive. We have endeavored to give a sectional view, so to speak, of the foundations of the reciprocal rights and duties of the parties to each contract of employment, so far as the system and place of work and the appurtenances, animate and inanimate, are concerned. We have not attempted to display the whole structure that has been built upon these foundations. There are many subordinate principles, special applications, and corollary doctrines running all through this branch of the law; but all these trace back to, are founded on, and are absolutely governed by these fundamentals. We hope that we have made it clear that assumption of risk is a defense which arises only from the contract that creates the relationship essential to the duty upon the breach of which the plaintiff's cause of action rests. Theoretically speaking, contributory negligence has no different meaning in actions by the servant against the master from that which it universally has in suits based on torts.

These foundations of liability and of defense, when reduced to final analysis, are but phases of well-recognized common-law principles. If we bear in mind that assumption of risk finds its origin in the law of contract, and is governed by the usual canons of construction applicable in the field of contract law, and that contributory negligence finds its origin in the law of torts, and is governed by its cardinal canons, and that both defenses may arise from the same set of circumstances, though they do not necessarily do so, we ought to be able to deal with them without confusion. The opening statement in Labatt's wonderful work on the law of Master & Servant, that "the doctrines which define the extent of a servant's right to recover damages for personal injuries received in the course of his employment represent, broadly speaking, the result of a compromise between the principle that a servant agrees to assume all the risks incident to the work undertaken by him, and the principle that a master is answerable for the consequences of any negligent acts which may be committed by himself or his agents," is not strictly accurate. It is not so much a case of compromise as it is a case of harmonious joint application of the principles of tort and contract to which we have had reference in the foregoing discussion. While there is no reported common-law case in which the servant sued the master for injuries received pending the employment, still every doctrine applicable to this (now generally considered separate) branch of jurisprudence is merely some familiar common-law principle, adjusted to the special facts.

5. Under the allegations of the petition before us, it can hardly be said that the plaintiff assumed the risk of carrying the ladle of hot iron without the assistance of the third man. Assumption of risk, being contractual, connotes choice, freedom of consent. The law would hardly imply against the plaintiff, under the circumstances detailed, a waiver of the defendant's breach of duty, in leaving him unaided in the task, from the fact that he carried the ladle for the few feet that intervened between the flask and the point where the third man was called away before he attempted to put it down, instead of letting it fall to the ground and abandoning it immediately. Before we can infer that there was a free choice, it must appear that there was a reasonable opportunity to choose.

6. Whether the defendant was guilty of contributory negli-

gence or not depends upon whether a reasonably prudent man, situated as he was, would have done as he did or not. Assumption of risk respects consent, the act of will; contributory negligence respects assent, the act of the judgment, and conduct thereunder. Burdick on Torts, 170; Davis Coal Co. *v.* Polland, 158 Ind. 607 (62 N. E. 492, 92 Am. St. R. 319). For a discussion of the difference between consent and assent, see *Williams* v. *Fain, 2 Ga. App.* 136 (58 S. E. 307). If he went on with the attempt, when prudence required him to stop, or if he carelessly or negligently conducted himself pending the dangerous situation, if by the exercise of ordinary care he could have avoided the injury, he was guilty of contributory negligence. The liberal attitude which the courts assume toward men when confronted with an emergency demanding such quick action as to rob the judgment of all or a material part of its activity requires us to hold that the plaintiff's contributory negligence under the circumstances alleged is peculiarly a question for the jury.          *Judgment reversed.*